IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TRACIE KING,<br><br>     Plaintiff,<br><br>v.<br><br>CELLCO PARTNERSHIP dba VERIZON WIRELESS,<br><br>     Defendant. | MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT<br><br>Case No. 2:20-cv-00775-JNP-DAO<br><br>District Judge Jill N. Parrish |

Before the court is a motion for summary judgment filed by defendant Cellco Partnership dba Verizon Wireless (Verizon). ECF No. 137. The court GRANTS the motion.

## BACKGROUND

In 2004, Verizon hired Tracie King, who is Black, to work in its Salt Lake City call center. In 2009, Verizon promoted King to a supervisor position. Verizon temporarily assigned King to an Acting Associate Director position for six months in 2013. As an Acting Associate Director, King managed a team of supervisors.

While King worked as an Acting Associate Director, her supervisor, Call Center Director Jeff Morrison, conducted "skip-level meetings" with King's subordinates. Skip-level meetings take place outside of the presence of the direct manager so that employees can speak openly about their supervisors. At times, skip-level meetings were also used to discover any flaws in a supervisor's performance. During the skip-level meetings, two or three of the male employees under King told Morrison that they felt that King treated them differently than female employees. After conducting the skip-level meetings, Morrison met with King to give her feedback. On Morrison's recommendation, King then met with her team to talk about issues

raised in the skip-level meetings. When her six-month term as Acting AD was up, King returned to her supervisor position.

In September 2014, Verizon promoted Rodrigo Dos Santos to the position of Associate Director. King began reporting to Dos Santos. In March 2015, Dos Santos conducted a group skip-level meeting with King's team. Her subordinates told Dos Santos that there were aspects of her management style that were good, while other aspects could benefit from improvement. Dos Santos did not take any disciplinary action against King based on the skip-level meeting and continued to support her in her role as a supervisor. King was not informed about the skip-level meeting with her team. After the meeting, King perceived that her team was acting differently and asked L.Y., one of her subordinates with whom King had a friendly relationship, what was going on. L.Y. told King about the skip-level meeting.

On May 17, 2015, L.Y. asked to meet with Dos Santos. L.Y. told Dos Santos that after the March skip-level meeting, King was upset with her because she had not texted King to inform her about the meeting in advance. L.Y. said that King asked her what was said during the skip-level meeting.[1] L.Y. declined to tell King what happened in the meeting, stating that the meeting was private and just a "regular business practice." L.Y. told Dos Santos that King became angry with her and stated: "Oh, you want to make this just business? Well, then, let's talk about your metrics, let's talk about your job." L.Y. stated to Dos Santos that she perceived this statement to be a threat that King could get her fired or make her work life difficult if she wanted. Dos Santos asked L.Y. whether he could forward her complaint to human resources. L.Y. responded that he could.

_____

[1] In her deposition, King denied asking L.Y. what happened in the skip-level meeting. But King does not dispute that L.Y. told Dos Santos that she had done so.

Dos Santos reported L.Y.'s complaint to Kevin Atkinson, who is Black and worked in Verizon's human resources department. Atkinson began an investigation of the complaint on May 18, 2015. He interviewed L.Y. and 17 other individuals as part of his investigation, including members of King's team and employees that she supervised when she was an Acting Associate Director. Dos Santos sat in on the interviews. Atkinson took detailed notes of the interviews. Many of the interviewees reported that King played favorites with the individuals that she supervised, treating those in her inner circle favorably while giving the cold shoulder to those outside of the in-group. Employees also stated that King would belittle subordinates if she perceived them to be disloyal to her or if they displeased her in some way. Many individuals shared that they had been afraid to speak out against King because they feared retaliation. Employees reported that King became angry if she learned that a subordinate said something negative about her during a skip-level meeting. Two employees said that King had told them that they should be careful what they said about her because they would not know who King's allies were. Employees stated that she ruled by "dictatorship" and "led by fear and coercion."

King told Atkinson's supervisor and the Human Resources Manager, Brian Cervinski, that she did not want to meet with Atkinson and Dos Santos because she did not trust them. Accordingly, Cervinski decided that he would interview King regarding the L.Y. complaint. During her interviews with Cervinski, King denied the conduct interviewees had described to Atkinson. Cervinski relayed this information to Atkinson.

On May 21, 2015, three days after Atkinson began his investigation of the L.Y. complaint, King lodged a complaint against Dos Santos in an email exchange with Cervinski. In the emails, King stated that she knew that she was being investigated, but that she was going to request to speak with Cervinski regardless of the investigation. King stated that Dos Santos made

3

her feel like she was in a "hostile work environment." Based on the King complaint, Cervinski opened an investigation into Dos Santos. Cervinski interviewed King and 13 additional witnesses as part of this investigation.

During her interviews, King told Cervinski that Dos Santos told a new supervisor that she should not seek mentorship from King because '[h]er brand is bad." King also reported that during a meeting, Dos Santos was discussing the movie, *The Godfather*. He gave various employees nicknames based on the movie and then said, "there's getting ready to be a bloodbath," while looking at King. She said that the comment made her uncomfortable. King also told Cervinski that she later complained to Dos Santos that she felt like she was being bullied and that she had a target on her back. King said that Dos Santos gestured his hand towards her like a gun and "pulled the trigger." Finally, King claimed that Dos Santos had discriminated against her and another employee during a shift bid. In late 2014, Verizon adopted a blind shift-bid policy, meaning that employees would not know which supervisors were associated with the various shifts before making their bids. The policy was designed to prevent employees from choosing their supervisors. King and a Black female employee on her team, N.Y., asked for an exception from Verizon's new blind-bid policy so that N.Y. could stay on King's team. Dos Santos denied the request for an exception, stating that it would not "look right." King believed that the denial was based on discriminatory racial animus because both she and N.Y. are Black.

Cervinski interviewed Dos Santos about King's allegations. Dos Santos denied making a gun gesture toward King. Another supervisor in the area when King was speaking with Dos Santos denied seeing Dos Santos make a gun gesture. Other employees told Cervinski that they recalled Dos Santos's "blood bath" comment, but they did not interpret the comment negatively.

4

King also complained to Cervinski about the Call Center Director, Larry Hollingsworth. Believing that King was instigating negative feelings about the new bid process among the employees, Hollingsworth called King into his office. King told Cervinski that Hollingsworth criticized her for being a negative influence, told her that she thought she was better than her peers, and said that King put herself on a pedestal. During the meeting, King told Hollingsworth that she did not like the new blind-bid process and stated that she believed that criticism directed towards herself and N.Y. regarding the shift bid controversy was racially motivated. Atkinson interviewed Hollingsworth regarding King's accusations. Hollingsworth denied saying that King thought she was better than others or that she put herself on a pedestal.

On June 19, 2015, Cervinski finalized a report summarizing his findings for his investigation of King's complaint against Dos Santos and Hollingsworth. Cervinski found that King's complaints regarding a hostile working environment and discrimination were unsubstantiated. He further concluded that Dos Santos, after consulting with human resources, elected to follow standard shift bid procedures rather than grant an exception to N.Y. Cervinski noted, however, that a number of employees that worked under Dos Santos found that he could portray himself as "demanding, loud and aggressive." Subordinates also reported that he had made improvements since he first became an Associate Director in September 2014, he was receptive to feedback, had implemented changes to improve himself as a leader, and he "cares and supports them 100%." Cervinski determined that the appropriate resolution of the complaint against Dos Santos was to provide him feedback regarding how he can come across to subordinates and that he needs to be more approachable when meeting new employees.

On June 22, 2015, Atkinson completed a report summarizing his findings regarding his investigation of the L.Y. complaint against King. Atkinson concluded that King had used

intimidation tactics against employees that questioned her or did not align with her, that she had engaged in inappropriate behavior towards fellow employees, and that she favored some employees on her team. Atkinson also found that King had interfered with his investigation of the L.Y. complaint by recruiting other employees to support her during the investigation and to question other employees regarding what they told Atkinson in their interviews. Atkinson also found that King asked subordinates to tell her what was said about her during group skip-level meetings and that King threatened to punish L.Y. if she showed disloyalty by not telling her what was said in a skip-level meeting. Based on these findings, Atkinson recommended that King be terminated.

Cervinski reviewed Atkinson's report. Based on the consistent testimony regarding King, Cervinski concluded that the reports were accurate. Cervinski further concluded that King had violated two provisions of Verizon's code of conduct: the "Maintaining an Inclusive, Fair and Healthy Work Environment" provision (Healthy Work Environment Policy) and the "Cooperation with Investigations" provision (Cooperation with Investigations Policy). Cervinski prepared a termination request and submitted it to his superiors: Sarah Lofgren, the Human Resources Associate Director; Annette Lowther, the Human Resources Director; and Monica Hammond, a Verizon Vice President. All three approved Cervinski's recommendation. On July 3, 2015, Cervinski informed King that she was being discharged.

On April 6, 2016, King filed a Charge of Discrimination with the Utah Anti-discrimination and Labor Division. She then filed an action against Verizon alleging three claims under Title VII of the Civil Rights Act of 1964: discriminatory discharge, retaliatory discharge, and hostile work environment. Verizon moves for summary judgment on each of these claims.

6

**LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment on a claim is required if the party that bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

**ANALYSIS**

**I.    DISCRIMINATORY DISCHARGE**

    *A.    Legal Standard*

King alleges that Verizon violated her rights under Title VII by firing her because of her race. Because she relies on circumstantial evidence to prove her discrimination claim, it is subject to the *McDonnell Douglas* burden-shifting framework on summary judgment. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). This three-step analytical framework first demands that a plaintiff carry her initial burden of establishing a prima facie case of racial discrimination. *Id.* at 802. If the plaintiff satisfies this step, the burden then shifts to the defendant to "to articulate some legitimate, nondiscriminatory reason" for discharging the defendant. *Id.* Finally, the burden shifts back to the plaintiff to show that that the employer's stated reason for the discharge was pretextual. *Id.* at 804.

Verizon argues that it is entitled to summary judgment because King cannot satisfy either step one or step three of *McDonnell Douglas*. Because the court concludes that King has not met her burden to show pretext under step three, the court need not analyze whether King has established a prima facie case under step one.

Verizon contends that it fired King because she violated its Healthy Work Environment Policy and Cooperation with Investigations Policy, not because of racial animus. In order to avoid summary judgment, King must show that Verizon's stated reason for the termination was pretextual. "A plaintiff may show pretext by demonstrating the 'proffered reason is factually false,' or that 'discrimination was a primary factor in the employer's decision.'" *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (citations omitted). "This is often accomplished 'by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.'" *Id.* (citation omitted). "A plaintiff may also show pretext by demonstrating 'the defendant acted contrary to a written company policy', an unwritten company policy, or a company practice 'when making the adverse employment decision affecting the plaintiff.'" *Id.* (citation omitted). "'The relevant inquiry is not whether [their] proffered reasons were wise, fair or correct,' but rather we ask whether they believed those reasons to be true and 'acted in good faith upon those beliefs.'" *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) (alteration in original) (citation omitted).

King argues that she has shouldered her burden of showing pretext for three reasons. The court addresses each argument in turn.

B.       *Prior Discriminatory Treatment*

First, King argues that a jury could disbelieve Verizon's stated reasons for firing her based on a number of acts of discrimination against herself and other minority Verizon employees. In support of this argument, King presented evidence that she was subjected to the following instances of discrimination. In 2005, her supervisor commented that a headscarf that she was wearing made her look like she was in a gang. In 2007, King complained to two supervisors that customers had used a racial slur during service calls. The supervisors responded that King was taking the slur too personally. In 2009, a notification appeared on King's computer that she needed to complete a training on avoiding Ebonics. When King complained to a human resources manager, the notice disappeared. In 2010, a co-worker told King that the only reason that she was a supervisor was because she was Black. In 2011 or 2012, a Black Associate Director told King that if she worked for Verizon in another state that she would have already been promoted to Associate Director. And in late 2014, King attempted to help a Black subordinate obtain an exception to the blind shift-bid policy so that she could stay on her team. Dos Santos declined to make an exception to the policy because he said that it would not "look right." King believed that the denial was based on discrimination because she and the employee are both Black. Believing that King was instigating negative feelings about the new bid process among the employees, Hollingsworth called King into his office. He criticized her for being a negative influence and for putting herself on a pedestal.

King also points to evidence of discrimination against other employees who were minorities. For example, an Asian employee felt that he needed to adopt the hairstyle and dress of White LDS employees in order to fit in and progress in his career. Another Black supervisor moved from the Sacramento call center to the Salt Lake City call center. He testified that he was

held to a higher standard that other non-Black supervisors and that he "went from hero to zero" when he transferred to Salt Lake City. Finally, when King wanted to give an award to a Black subordinate recognizing her team commitment, Dos Santos told her not to do so because it would give the appearance of favoritism.

King argues that these examples of past discrimination call into question Verizon's articulated reasons for her termination. But King did not cite evidence tying these past instances of discrimination to her termination. "[A]necdotal evidence of discrimination should only be admitted if 'the prior incidences of alleged discrimination can somehow be tied to the employment actions disputed in the case at hand.'" *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 885 (10th Cir. 2018) (citing *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1289 (10th Cir. 2000)). A plaintiff can provide this link by showing that the individual that perpetrated past acts of racism was later involved in the decision to fire the plaintiff. *Id.* If the plaintiff does not provide evidence of such a link, past instances of discrimination are insufficient to prove pretext. *Stewart*, 217 F.3d at 1289; *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 856 (10th Cir. 2000) ("[S]tray racial comments should typically not be admitted unless the plaintiff can link them to personnel decisions or the individuals making those decisions."); *Simms v. Oklahoma*, 165 F.3d 1321, 1330 (10th Cir. 1999) (holding that a plaintiff cannot prove pretext unless he or she shows that the individuals involved in past discrimination took part in the challenged employment action). Here, the evidence shows that Atkinson, Cervinski, Lofgren, Lowther, and Hammond all participated in the process that resulted in King's termination. Because King does not cite any evidence that these past instances of discrimination were perpetrated by these decision makers, King has not produced relevant evidence of pretext.

King contends that even though Dos Santos did not have firing authority or directly participate in the review process that resulted in her termination, evidence of discriminatory animus on the part of Dos Santos is relevant under a "cat's paw" theory of causation. The court disagrees. "In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006). "To prevail on a subordinate bias claim, a plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process. Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action." *Id.* at 487. If an employer conducts an independent investigation of the allegations of a biased subordinate, "the causal link is defeated." *Id.* at 488.

There is no evidence to support cat's paw liability for Dos Santos. He did not submit discriminatory reports or recommendations that caused upper management to terminate King. He merely forwarded L.Y.'s complaint to human resources. Atkinson independently interviewed L.Y. in order to get her side of the story. Moreover, the fact that Dos Santos sat in on interviews is not evidence of a "deliberate scheme to trigger a discriminatory employment action." *Id.* at 484. King has not presented evidence that Dos Santos manipulated the investigation or otherwise influenced the process to get her fired. Moreover, Verizon's independent investigation of King, involving multiple interviews with King and with 17 other witnesses, severs any causal link between Dos Santos and Verizon's decision to terminate King. *See id.* at 488 ("[A]n employer can avoid liability [under a cat's paw theory] by conducting an independent investigation of the allegations against an employee.").

11

In short, King has not cited evidence supporting a link between incidents of discrimination in her workplace and Verizon's decision to fire her. Accordingly, these discriminatory acts do not support an inference that Verizon's stated reasons for the termination are pretextual.

C.    *Similarly Situated Employees*

"[A] plaintiff may . . . show pretext on a theory of disparate treatment by providing evidence that he was treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000). In determining whether employees are similarly situated, courts "compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." *Id.* (citation omitted). "Not every difference in treatment, of course, will establish a discriminatory intent." *Id.* "Differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext." *Id.*

King argues that Verizon's treatment of similarly situated employees who are not Black shows that Verizon's stated reasons for her discharge are pretextual. She contends that two non-Black employees were not fired after committing similar infractions of Verizon's employee conduct code. First, King notes that Verizon disciplined a fellow supervisor, Julian Hernandez, for violating its Healthy Work Environment Policy around the time of her discharge. Verizon found that Hernandez had been abrasive and condescending toward other employees. Verizon gave Hernandez a written warning for his behavior but did not fire him. Second, King points to Dos Santos. After an investigation, Verizon determined that Dos Santos could come across as "demanding, loud and aggressive" to fellow employees but did not formally find that he had

violated the Healthy Work Environment Policy. Verizon provided feedback to Dos Santos that he needed to be more approachable and open with new employees.

The court finds that Verizon's treatment of Hernandez and Dos Santos does not show pretext because these employees were not similarly situated to King. First, they did not violate the same policies. Verizon found that King violated both its Healthy Work Environment Policy and its Cooperation with Investigations Policy. Hernandez and Dos Santos only violated the Healthy Work Environment Policy.[2] They did not undermine Verizon's investigations. In contrast, Verizon uncovered evidence that King told her subordinates not to say anything negative about her because they would not know who her allies were and used intimidation to suppress negative reports of her conduct. Verizon also found that King attempted to influence what employees would say about her during investigations by soliciting positive testimony and recruited employees to inform her about what others said about her during Verizon's investigation. This conduct sets King apart from Hernandez and Dos Santos. *See id*. at 1233 ("A company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct.").

Second, the violations of Hernandez and Dos Santos were not as serious as King's violations of Verizon's policies. "[E]mployees who are similarly situated must have been disciplined for conduct of 'comparable seriousness' in order for their disparate treatment to be relevant. *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006); *accord Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995) ("When comparing the relative treatment of

---

[2] Although the parties have not cited evidence that Verizon formally found that Dos Santos violated the Healthy Work Environment Policy, the problematic behavior described in the Cervinski report suggests a potential violation of this policy.

similarly situated minority and non-minority employees, the comparison need not be based on identical violations of identical work rules; the violations need only be of 'comparable seriousness.'" (citation omitted)). The actions of Hernandez and Dos Santos were not of comparable seriousness with King's actions because they took responsibility for their actions and demonstrated their willingness to improve. When Cervinski discussed with Hernandez an incident where he had behaved inappropriately, Hernandez "took ownership for what had taken place" and apologized for his inappropriate behavior to the employee that he had offended. Dos Santos's subordinates also reported that he had improved since becoming an Associate Director in September 2014 and that he was receptive to feedback and had implemented changes to improve himself as a leader. When another subordinate complained that Dos Santos provided negative feedback, Dos Santos "immediately apologized and talked about all of the good things the supervisor was doing to lead the team." King, on the other hand, consistently denied the many reports of inappropriate behavior from her co-workers. Cervinski also found that King was not receptive to feedback and that she interpreted coaching as "attacking" her.

The Tenth Circuit has recognized that an employee that accepts responsibility for the violation of a rule and commits to mend his or her ways is not similarly situated to an employee that is uncooperative and does not accept responsibility. *McGowan*, 472 F.3d at 745 (holding that employees were not similarly situated where the comparator "was truthful and cooperative in the . . . investigation. [The plaintiff], by contrast, was found to have violated both state law and City policy, falsified the jail register regarding her visual inspections, and been uncooperative during the . . . investigation."); *Kendrick*, 220 F.3d at 1233 (holding that a comparator was not similarly situated where, unlike the plaintiff, the comparator's union representative vouched that he would "'walk the straight and narrow' in the future" and the comparator made "conciliatory gestures" to

14

the supervisor he had threatened). Because King did not acknowledge any wrongdoing, accept feedback, or demonstrate any desire to change, she was not similarly situated to Hernandez or Dos Santos.

      *D.    The Investigation*

      King argues that purported irregularities in Verizon's investigation of her conduct demonstrates pretext. "A 'failure to conduct what appeared to be a fair investigation of' the violation that purportedly prompted adverse action may support an inference of pretext." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1314 (10th Cir. 2017) (citation omitted). But "[n]ot every imperfect or errant action by an employer [in conducting an investigation] will provide a sufficient basis for an employee to satisfy his burden at the pretext stage." *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1082 (10th Cir. 2023). "[F]or an inference of pretext to arise on the basis of a procedural irregularity, there must be some evidence that the irregularity *directly and uniquely disadvantaged [the employee]*." *Id.* at 1083. (citation omitted) (second alteration in original). "[A]n employer may ordinarily 'defeat the inference' of pretext stemming from an allegedly unfair investigation by 'simply asking an employee for his version of events.'" *Dewitt*, 845 F.3d at 1314 (citation omitted).

      King first contends that the group skip-level meeting conducted by Dos Santos in March 2015 was suspect because he never notified King of the meeting. But that skip-level meeting was only tangentially related to the investigation that resulted in King's discharge. King does not dispute that Dos Santos took no disciplinary action against King based on the skip-level meeting and continued to support her in her role as a supervisor. It was L.Y.'s report of King's threatening behavior in reaction to the skip-level meeting the triggered Verizon's investigation. Thus, any irregularities in the skip-level meeting are not relevant. Moreover, King has not cited

evidence that informing a supervisor of a skip-level meeting was standard practice. Indeed, King contends that Verizon has no formal policy on skip-level meetings.

King also asserts that Verizon's investigation was "over-blown" because Atkinson interviewed too many witnesses. But King does not cite any evidence to suggest that interviewing 17 witnesses was out of the ordinary. Verizon's investigation of King's complaint against Dos Santos included nearly as many interviews—14 in all. Additionally, conducting a thorough investigation of a complaint does not constitute evidence of discriminatory animus.

Next, King complains that Dos Santos, whom she had accused of wrongdoing, participated in the interviews conducted during her investigation. However, most of the interviews (11 of 17) occurred before King leveled accusations of wrongdoing against Dos Santos. And it was Atkinson, not Dos Santos, that drew conclusions form the interviews and wrote the report recommending termination. In the end, a supervisor sitting in on interviews for an investigation of his subordinate is not inherently suspicious.

Finally, King argues that Cervinski's termination request form was inaccurate and incomplete. King points to a section of the termination request form entitled "Current Warnings and Prior Warnings" where Cervinski erroneously indicated that Verizon had given her "feedback" in relation to interactions with a subordinate in April 2014. But this single, stray sentence had nothing to do with the reasoning of Cervinski's report—that King should be fired for her violations of the Healthy Work Environment Policy and Cooperation with Investigations Policy based on the evidence uncovered during the investigation. King also claims that Cervinski's failure to mention Kings complaint against Dos Santos or to include her denials of wrongdoing in the termination request creates an inference of discriminatory animus. These omissions, however, are easily explained by the fact that Cervinski disbelieved King's

16

allegations against Dos Santos and her blanket denials that she had done anything wrong. *See Est. of Bassatt v. Sch. Dist. No. 1*, 775 F.3d 1233, 1240 (10th Cir. 2014) (holding that an employer's decision to believe one employee's testimony over another employee's denials "is not evidence of pretext"). Moreover, King's allegations against Dos Santos are not relevant to the question of whether she had violated policies that merited dismissal. Verizon was required to give King an opportunity to give her side of the story during the investigation, which it did. Verizon was not required to include every fact she may have wished to include in the final termination request.

In short, King has not demonstrated any irregularity in the investigation that "*directly and uniquely disadvantaged*" her. *See Markley*, 59 F.4th at 1083. All that is typically required to defeat an inference of pretext is that the employer afford the employee a chance to give his or her version of events. *Dewitt*, 845 F.3d at 1314. Verizon did so here. Indeed, when King stated that she did not want to give her side of the story to Atkinson and Dos Santos because she did not trust them, Cervinski accommodated her by agreeing to interview her. Accordingly, King has not shown that Verizon's investigation indicates pretext.

\*     \*     \*

Because King has not carried her burden of showing that Verizon's stated reasons for her termination are pretextual, Verizon is entitled to summary judgment on King's discriminatory discharge claim.

## II.     RETALIATORY DISCHARGE

King also claims that Verizon violated her rights under Title VII because it fired her in retaliation for her good faith reports of racial discrimination. To establish a prima facie case for retaliatory discharge, King must show that "(1) [she] engaged in protected opposition to

discrimination; (2) [Verizon] took action against [her] which a reasonable person would have found materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action." *Singh v. Cordle*, 936 F.3d 1022, 1042 (10th Cir. 2019). Like the discriminatory discharge claim, King's retaliatory discharge claim is subject to the *McDonnell Douglas* burden-shifting framework on summary judgment. *Id*.

Verizon argues that it is entitled to summary judgment on King's retaliatory discharge claim because she cannot satisfy either step one or step three of *McDonnell Douglas*. Because, once again, the court concludes that King has not met her burden to show pretext under step three, the court need not analyze whether she has established a prima facie case under step one.

King argues that she can show pretext through temporal proximity between her protected opposition to discrimination and Verizon's materially adverse actions against her. King asserts that she opposed discrimination in December 2014 by objecting to Dos Santos's denial of an exception to the blind shift-bid process for N.Y. King further contends that Version subjected her to adverse actions when Dos Santos gave her feedback about aligning with company messaging and when Hollingsworth called her into his office for a two-hour meeting in which he told King that she was a negative influence and that she put herself on a pedestal. King argues that these adverse actions culminated in her discharge in July 2015 and that these events were close enough in time to suggest that the reasons for her termination were pretextual.

Setting aside the question of whether King cited evidence that she communicated an opposition to racial discrimination when she objected to the blind shift-bid process, King has not shown that Verizon's stated reasons for her termination are pretextual. Although temporal proximity may be sufficient to establish a prima facie case for retaliatory discharge, as a matter of law, it is not sufficient to prove pretext. *Wise v. DeJoy*, 71 F.4th 744, 754 (10th Cir. 2023)

18

(holding that "pretext can't rest on temporal proximity alone"); *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007) (holding that "temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext"). Moreover, Dos Santos and Hollingsworth did not participate in the investigation that resulted in King's termination. Accordingly, King has not produced evidence of a causal link between her alleged protected activity and her termination.

For these reasons, King has not met her burden of showing pretext. The court, therefore, grants summary judgment on her retaliatory discharge claim.

## III.   HOSTILE WORK ENVIRONMENT

Finally, King alleges that Verizon is liable under Title VII for creating a hostile work environment. In order to survive summary judgment on a hostile work environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1327 (10th Cir. 2004). The plaintiff must demonstrate that "the harassment was racial or stemmed from racial animus. General harassment if not racial . . . is not actionable." *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994).

Verizon argues that King's hostile work environment claim is bared by the statute of limitations. The court agrees. King filed a Charge of Discrimination on April 6, 2016. Because the charge must be filed within 300 days of "the alleged unlawful employment practice," events that occurred on or after June 11, 2015 fit within the look-back period for a Title VII claim. *See* 42 U.S.C. § 2000e-5(e)(1). Since a hostile work environment claim typically involves acts that occur over a period of time,

> [i]t does not matter, for purposes of the statute, that some of the
> component acts of the hostile work environment fall outside the
> statutory time period. Provided that an act contributing to the claim
> occurs within the filing period, the entire time period of the hostile
> environment may be considered by a court for the purposes of
> determining liability.

*Hansen v. SkyWest Airlines*, 844 F.3d 914, 923 (10th Cir. 2016) (alteration in original) (citation omitted). Thus, in order to fit her hostile work environment claim within the statutory look-back period, King must identify at least one act that contributed to the alleged hostile work environment that occurred on or after June 11, 2015.

King first argues that her discharge, which occurred in July 2015, constituted race-based harassment that occurred within the statutory period. But, as discussed above, King has failed to show that her discharge was based on racial animus rather than Verizon's stated reasons for her termination. Thus, her termination cannot serve as an act of discriminatory harassment within the statutory period. Next, King asserts that Verizon's investigation of the L.Y. complaint against her constituted race-based harassment. King, however, does not cite any evidence of harassing conduct in relation to the investigation. And to the extent that she complains about the outcome of the investigation, King's argument fails for the same reasons stated above. Finally, King contends in passing that Verizon's investigation of her complaint against Dos Santos constituted harassment. But King does not provide any explanation as to precisely what actions taken during the Dos Santos investigation that she considered to be harassment.

In sum, King has not produced any evidence of an act of "discriminatory intimidation, ridicule, [or] insult, that [was] sufficiently severe or pervasive to alter the conditions of [King's] employment and create an abusive working environment" that occurred on or after June 11, 2015. *See Sandoval*, 388 F.3d at 1327. Absent an act of harassment within the 300-day statutory

20

period, King cannot prevail on her hostile work environment claim. Accordingly, the court grants summary judgment on this claim.

## CONCLUSION

For the above-stated reasons, the court grants summary judgment in favor of defendant Verizon on all claims.

DATED March 25, 2023.

BY THE COURT

Jill N. Parrish
United States District Court Judge

21